UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **ROBERT HUBBLE,** *on behalf of himself and all others similarly situated,*<br><br>        *Plaintiff*,<br><br>v.<br><br>**LOANDEPOT.COM, LLC,**<br><br>        *Defendant*.<br>_____/ | Case No. 1:24-CV-11173-TLL-PTM |

**DECLARATION OF SAEED GHASEMZADEH IN SUPPORT OF DEFENDANT LOANDEPOT.COM, LLC'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL DOCUMENT PRODUCTION**

I, Saeed Ghasemzadeh, declare:

1.     I am over the age of eighteen (18) years, and I have direct and personal knowledge of the matters set forth in this Declaration. If called and sworn, I could and would competently testify to the following facts. I submit this Declaration in support of Defendant loanDepot.com, LLC's Opposition to Plaintiff's Motion to Compel Document Production.

2.     I am the EVP of Enterprise Contract Strategy of loanDepot.com, LLC ("loanDepot"). In that role, I have access to and am the point person for data searches and extractions at loanDepot related to data sets related to outbound calls and lead records for the direct-to-consumer division of loanDepot. I am aware of loanDepot's server resources and limitations—as well as pertinent databases, tables

1

and data elements—related to the data sets at issue in Plaintiff's motion to compel. I also previously oversaw call center operations at loanDepot and am highly familiar with its policies and practices respecting compliance with the Telephone Consumer Protection Act ("TCPA") and outbound calling practices generally.

3. loanDepot is a highly-rated mortgage company that provides lending solutions to consumers nationwide

4. loanDepot provides information regarding its lending to consumers in a number of ways. Pertinent to this case, it will make live outbound calls to consumers but only when consumers have provided prior express written consent to receive calls from loanDepot.

5. Like all businesses, loanDepot will contact consumers who ask to be called by it—but loanDepot *never* uses prerecorded "robocalls" to contact consumers and *never* cold calls consumers.

6. While loanDepot only makes live calls, it will, at times, leave prerecorded voicemails for consumers who do not pick up a call. It will do so only if it has express written consent to leave such voicemails, however.

7. On March 27, 2024, an individual filled out a form on a website—https://27.mysupersamples.com/—requesting a phone call that might meet the consumer's needs.

8. The lead submission was transferred to loanDepot as a potentially qualified lender and loanDepot attempted calls as a result.

9. I have reviewed Plaintiff's interrogatories, set one and requests for production, set one in this case. More specifically, I have reviewed interrogatory nos. 2, 3, 7 and requests for production nos. 5 and 15.

10. Searching for any and all employees or vendors that were involved in making outbound calls as part of loanDepot's contact to Plaintiff responsive to Plaintiff's Interrogatory No. 2 would be incredibly time-consuming. And then providing a description of the work done by each employee or vendor responsive to Plaintiff's Interrogatory No. 3 may consume hundreds of hours of time.

11. In order to state all facts in support of the contention that any putative class member provided consent to receive calls in response to Interrogatory No. 7, first, class members need to be identified. To do that, loanDepot needs to determine the phone numbers that loanDepot "called using an artificial or prerecorded voice messages for the same purpose Plaintiff was called" from May 2, 2020 through the date of class certification. I believe it would take at least dozens of hours just to accomplish this first step. Once these phone numbers are identified, then loanDepot would have to conduct a file by file search of each phone number and review the consent records for each. Such a search as to each class member would consume thousands of hours if not longer. Then, loanDepot would have identify the specific lead source for each of the phone numbers. Given the prevalence of multiple lead submissions, a large percentage of loanDepot's lead records come from multiple sources. So, identifying the specific lead source would take hundreds of hours if

3

not longer. Then, loanDepot would somehow have to access every individual Jornaya token or ActiveProspect's TrustedForm and individually open *each* consent record for *each* phone number to identify the specific website and content of that website from which consent was obtained. Then, in order to prepare a response to Interrogatory No. 7, loanDepot would have to copy the content of each website and date of the event for each single phone number. Given the millions of leads that loanDepot has purchased over the years, and because this process would have to be done individually and would be a phone-number-by-phone-number process, responding to Interrogatory No. 7, as phrased, would take approximately *millions* of hours to respond to. In other words, to do this process for *every call* loanDepot *ever* made would impose a massive burden on mission critical resources.

12. Searching for *all* complaints or do-not-call-requests concerning outbounds calls for *any* purpose across *all* channels over a multi-year time span responsive to Plaintiff's Requests for Production No. 5 would be incredibly time-consuming. And then to search for any response and internal correspondence regarding the same would take numerous hours if not longer because various employees' communication channels would need to be searched to even locate such communications.

13. The real challenge, however, are server resource issues. loanDepot servers are not built to do the sort of bulk mass review and extractions Plaintiff is requesting. For instance, querying disposition data sets—which contain *hundreds*

4

*of millions* of records (and billions of data elements)—to determine which phone numbers received prerecorded voicemails would likely be impossible in the current server environment. That is, the servers simply could not process the query and additional replicated server databases would need to be installed, integrated, and mapped to existing table structures. This work is expensive—both from a manpower and a hardware purchasing perspective—and could not be accomplished with loanDepot's current budgetary restraints.

14.   Not only is it difficult to perform the coding work necessary—and loanDepot has *extremely* limited resources available to perform this work in light of recent layoffs due to the state of the mortgage industry—its server resources are simply not sufficient to permit the sort of mass query contemplated here. Importantly, this is *not* the sort of query or extraction loanDepot performs in the ordinary course of its business and its server resources are allocated and established based upon its usual business needs. So, whereas querying for a specific consumer is commonly done—and easily performed by the server—querying even a few days' worth of data across a larger set of consumers swamps available resources and impacts production.

15.   While I have never attempted the sort of mass query and extraction Plaintiff seeks here, such work would likely "melt"—meaning shutdown—our servers and would result in my being fired. The only way the search can be performed in my view would be via a file by file (i.e., consumer by consumer) query

of the sort we usually perform. Running queries for each such consumer individually would take thousands of hours of work.

16. loanDepot does not maintain specific records responsive to any of Plaintiff's demanded records. Rather data elements responsive to each reside separately in multiple databases—and in some cases (such as records related to the identity of who loanDepot "intended" to contact) do not exist at all. The work of identifying and compiling existing phone numbers and information related to prerecorded voicemails left on putative class members phones would constitute the creation of a new record and would be burdensome as it would take at least thousands of hours of work as set forth in the preceding paragraphs.

17. loanDepot retains raw data regarding lead information and call disposition in various databases that would need to cross-compiled and extracted to create reports responsive to Plaintiff's RFP No. 15. And the process of creating those documents would be extremely burdensome—and perhaps impossible—as explained above.

18. It cannot be overstated that loanDepot has limited resources available to dedicate to the tasks Plaintiff demands in light of its financial condition and the mortgage market requiring mass downsizing. If the Court ultimately determines that some portion of the demanded records must be produced, I anticipate that I will be personally tasked with accomplishing the complicated coding, testing, extraction, auditing and reporting needed to fulfill the requirements of the Court. I

6

respectfully request ample time to perform the work given the massive burden it will place on my department's already tremendously strained mission-critical resources.

19. Last, but importantly, loanDepot has recently suffered a significant cyber event. As a result, access to loanDepot data systems has been heavily restricted and monitored. This makes it more difficult from a practical perspective for me to gain access to the sensitive data files Plaintiff demands I search. Further, any data removed from its servers would need to be properly encrypted and housed in a new safe environment. To my knowledge, Plaintiff has provided no plan with respect to safeguarding the massive quantity of sensitive consumer financial information he seeks.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this __18__ day of November 2024 in Irvine, California.

*Saeed Ghasemzadeh*
_____
Saeed Ghasemzadeh

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 18, 2024, I electronically sent the foregoing to counsel of record for the Plaintiff.

/s/ <i>Brittany A. Andres</i><br>
Brittany A. Andres

# Decl. of Saeed Ghasemzadeh iso MTC

Final Audit Report                                                                                        2024-11-19

| | |
|---|---|
| Created: | 2024-11-18 |
| By: | Randi Enison (renison@loandepot.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAccrLy28-NFnOVc6xCsi2DGYWpiOOXrMR |

## "Decl. of Saeed Ghasemzadeh iso MTC" History

- Document created by Randi Enison (renison@loandepot.com)
  2024-11-18 - 8:44:54 PM GMT- IP address: 165.225.222.243

- Document emailed to Saeed Ghasemzadeh (sghasemzadeh@loandepot.com) for signature
  2024-11-18 - 8:45:57 PM GMT

- Email viewed by Saeed Ghasemzadeh (sghasemzadeh@loandepot.com)
  2024-11-19 - 0:40:24 AM GMT- IP address: 104.47.51.126

- Document e-signed by Saeed Ghasemzadeh (sghasemzadeh@loandepot.com)
  Signature Date: 2024-11-19 - 0:41:24 AM GMT - Time Source: server- IP address: 136.226.65.101

- Agreement completed.
  2024-11-19 - 0:41:24 AM GMT

Adobe Acrobat Sign